UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ARIEL VIGO, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.3:11-CV-02044-G |
| | § | |
| | § | |
| | § | |
| GABE REED D/B/A GABE REED PRODUCTIONS, | § | |
| | § | |
| DEFENDANT. | § | |

### DEFENDANT'S FIRST AMENDED ANSWER & COUNTERCLAIMS

Defendant, Gabe Reed d/b/a/ Gabe Reed Productions, files this his First Amended Answer & Counterclaims to plaintiff Ariel Vigo's original complaint.

### I. ANSWER

1.   Admitted.

2.   Admitted.

3.   Admitted.

4.   Admitted.

5.   Admitted.

6.   Reed lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 6 of the Complaint.

7.   Reed lacks sufficient knowledge or information to form a belief about the truth of the allegations in paragraph 7 of the Complaint.

8.   Admitted.

9.   Denied.

10.  Denied.

11. Denied.

12. Denied.

13. Denied.

14. Reed admits the allegations in the first sentence of paragraph 14 in so far as Motley Crue played two shows for Argentine audiences in Buenos Aires, Argentina on or about May 19 and 20, 2011. Reed lacks sufficient knowledge or information to form a belief about the truth of the second sentence of paragraph 14. Reed denies the third sentence of paragraph 14.

15. Denied.

16. Reed incorporates and re-states each of his responses to each numbered paragraph above.

17. Denied.

18. Denied.

19. Denied.

20. Denied.

21. Reed incorporates and re-states each of his responses to each numbered paragraph above.

22. Denied.

23. Denied.

24. Denied.

25. Reed lacks sufficient knowledge or information to form a belief about the truth of the allegation in paragraph 25 of the Complaint.

26. Denied.

27. Denied.

28. Reed incorporates and re-states each of his responses to each numbered paragraph above.

29. Denied.

30. Reed admits that Motley Crue did not perform the live musical performance for Plaintiff.  Reed

denies all other allegations in paragraph 29 of the Complaint.

31. Denied.

32. Denied.

33. Denied.

34. Reed incorporates and re-states each of his responses to each numbered paragraph above.

35. Denied.

36. Denied.

37. Reed incorporates and re-states each of his responses to each numbered paragraph above.

38. Denied.

39. Reed incorporates and re-states each of his responses to each numbered paragraph above.

40. Denied.

41. Reed believes no response is warranted for this paragraph.

42. Reed believes no response is warranted for this paragraph.

43. Reed denies Plaintiff is entitled to any relief including, but not limited to, that sought in Plaintiff's Prayer for Relief.

## II. AFFIRMATIVE DEFENSES

### i. *Proportionate Responsibility*

45. Reed affirmatively asserts and contends that in the event Vigo is determined to have sustained any damages, Vigo's own acts or omissions proximately caused or contributed to those damages. Accordingly, Reed hereby asserts application of Chapter 33 of the Tex. Civ. Prac. & Rem. Code.

46. Vigo advertised and sold tickets to a Motley Crue concert without any contract, written or oral, between Vigo and Reed, in spite of Vigo's knowledge Reed had purchased exclusive rights to promote and produce four shows by Motley Crue in South America. Accordingly, all losses sustained by Vigo were proximately caused by his own acts or omissions.

### ii. *Equitable Estoppel*

47.     Reed affirmatively asserts application of the doctrine of equitable estoppel. While Vigo knew Reed had purchased exclusive rights to promote and produce four Motley Crue shows in South America and while Vigo knew he and Reed had failed to agree terms and thus had no contract, oral or written, Vigo nonetheless advertised a Motley Crue concert in Argentina and/or offered tickets to that concert for sale to the public. Indeed, Vigo did this without informing Reed of his actions in this regard.

48.     Reed justifiably relied on his and Vigo's failure to agree terms concerning the promotion and production of the Motley Crue tour in Argentina, manifesting this reliance by negotiating with other Argentinian promoters before discovering Vigo's actions.

49.     Accordingly, Vigo should be equitably estopped from attempting to enforce any terms of an agreement which he knows he never entered into with Reed.

### iii. *Unclean Hands*

50.     Reed affirmatively alleges Vigo comes to this Court with unclean hands in connection with the transaction out of which this litigation arose and with which it is connected in so far as Vigo has behaved unfairly as indicated in paragraph 47, *supra*.

### iv. *Voluntary Payment*

51.     Any payment Vigo made to Reed were made voluntarily, with full knowledge of all facts and without fraud, deception, duress or coercion, thus even though it may have been paid on a void demand, or upon a claim which had no foundation in fact, or without consideration, accordingly it cannot be recovered through a claim asserting unjust enrichment.

## III. COUNTERCLAIMS

### Factual Background

52.     Vigo is liable to Reed because a few days before Reed discovered Vigo had unilaterally wired money into a bank account referenced in a written offer made by Mr. Reed to Mr. Vigo (an offer

that was never accepted), Mr. Reed learned Vigo had unilaterally advertised a Motley Crue concert with Buckcherry as the supporting act for May 20, 2011 at Estadio Racing Club in Argentina. Neither this date, nor this venue had been agreed upon by Reed. The advertisement also falsely claimed tickets could be purchased beginning on February 1, 2011. Accordingly, Vigo had begun advertising and offering tickets for sale for a concert promoted by Mr. Reed in which Vigo had no interest. Mr. Reed e-mailed Vigo on January 20, 2011, stating "What is this? Announcing the show with no deposit is not right and underhanded."

53. On January 27, 2011, Mr. Reed wrote to Vigo via e-mail again, stating:

> 1. We met on 12/12/10, you asked to move the dates from March to April/May. We agreed that you would send 100k before the week after our meeting and I would work to reschedule the dates. No money was ever received.
> 2. On 12/20/10 I sent you a draft contract and re-sent it again 2 days later at your request.
> 3. I then didn't hear from you on the contract (despite sending multiple emails asking for the status) until December 30 only to be told that you rejected the contract, wanted the riders again (already sent to you) and that nothing would be done while you were on vacation until 1/10/11. You then said your lawyer was revising the contract. To date no contract was ever sent to me.
> 4. Last week, I receive notice from my sources in Buenos Aires that an article appears with your venue and requested date information. I know its not on your site but it was obviously a leak from your company. If a deposit had been paid beforehand then I would not have had any issue with this.
> 5. After you hear this week that I have received other higher offers from your competitors, you attempt to rush a deposit into my account after waiting more than a month to do so.
> 6. I repeatedly told you that offer you made was not going to work because it was too low and you refused to discuss it.

54. After additional e-mail exchanges, Reed wrote to Vigo again, Vigo responded (Vigo's responses are italicized):

> Ariel
> we haven't closed anything:
> 1. We don't have even a contract
> *The contract still not send it to you, because you contratc that was all wrong. Lacked many things Merchanding, copyrights, taxes, adding schedule bands to the festival, and many more decisions.*
> [Sic.]
> 2. I haven't even received a deposit from you
> *You have my 150k in your account. I sent you the receipt by the Bank of Panama, at least 5 times.*

> [Sic.]
> 3. You have been taking orders for "reserved" tickets
> *You're a madman! As we do that, is do not even have a design? Nothing, I think others just fill you with shit things in your head.* [Sic.]
> 4. Even though you deny it, you have leaked to the press that you have the show (it has run twice) which you don't.
> *If the press would know, I would have come out in the most important cables the country and nothing has come out. The truth is just you write silly words with just excuses. Do it easier, if you work with me to continue writing. But you do, send me back the money tomorrow. I do not want to work with an inexperienced suspicious as you. And I clarified Motley Crue will not play in Argentina in my venues, if the contract is with not me. I will introduce this to my partners in stadium not availables.* [Sic.]

55. As a result of Vigo's advertising this concert with the incorrect date and venue, and as a result of his advertising, and subsequently engaging in the pre-selling of tickets to the incorrectly advertised show, Vigo undermined the credence potential purchasers of tickets would give to legitimate promotional materials concerning the actual concerts when they were in fact confirmed. This resulted in low attendance for the concerts.

56. Furthermore, this activity created an impression in the minds of other local promoters that Vigo was the promoter for the concerts when in fact, he was not, and he knew that he was not.

57. As a result of Vigo's actions, Reed demanded via e-mail on January 28, 2011 that Vigo cease and desist from promoting or making ticket sales, and that Vigo cease advertising shows for which no agreement written or oral between Vigo and Reed existed. Mr. Reed stated clearly:

> Ariel
> 1. Cease and desist from any ticket sales - we have a picture of your company taking ticket orders.
> 2. Do not call AGI or TKO to tell them lies - you never sent a deposit in November and only sent a deposit - which I have yet to receive - after you heard that I had other offers. We don't even have a contract.
> 3. To top it all off – you are advertising – this was found in a record store and tweeted to us today: [here Mr. Reed attached an image of a poster advertising concerts which Vigo had no agreement with the talent or their promoter, Reed, to promote].

58. Vigo responded:

> *1 - STUPID! It says that tickets get to the sale on Tuesday, February 1, as it stood.*
> *If you can not read spanish, tell your friends that you are well informed.*

Page **6** of **10**

> *2 - Your contract was crap, without a lot of legal stuff. So we had to make another, was not valid. I am a client of AGI and TKO and they are honest like me. Agencies know you're a thief.*
> *Back my money, send me the wired paper/proof NOW and do not talk anymore.*
> *I hope not do more shit things to my friend Alfredo, still waiting for you contact the band and present.*
> *3 - I have allright to advertise the show, you got my 150.000k dollars in your account son of a bitch!*
> *Who the fuck you think you are, damn!*
> *STOP with lies or I'll put that to the lawyers of AGI above yours to demand.*
> *Carlos, Maxi, Cristian, les dejo las puertas abiertas. Si ustedes quieren cerrar el show, lo tienen en sus manos y no necesitan que les diga nada. Este tipo siguio negociando con ustedes, aun con contrato cerrado conmigo, y guita en su banco. Tengo los comprobantes y por eso estoy pidiendo la devolucion de lo mio. No esta bien ni eso ni negociar pero no los culpo, se que este tipo los busco a ustedes as que lo mejor, haganlo, yo no trabajo con personas asi.*[1] *[Sic.]*

59. Moreover, between late January and late February 2011 Vigo made numerous statements via e-mail to, *inter alia*, the following individuals: aalonso@bizarro.cl; peter.pappalardo@artistgrp.com; michael.arfin@artistgrp.com, Dan DeVita. For example, on January 28, 2011, Vigo wrote to Dan DeVita, stating:

> *This guy fucking Gabe have my money for CmeFest and still are in negociation with others, having a close deal with me, is a not responsable. Don't like this shit, I wait back my money and never talk with me anymore.* [Sic.]

60. Vigo's actions and statements caused Mr. Reed difficulty in negotiating transactions concerning the shows with other local promoters in Buenos Aires, and diminished the value of the shows to those other local promoters.

61. Indeed, as a result of Vigo's actions Mr. Reed ultimately contracted with a smaller promoter who placed the concert in a smaller venue causing Mr. Reed to lose not only an initial investment in the tour, but also to incur in excess of $150,000.00 in losses as a result of reduced ticket sales.

62. Mr. Reed communicated proprietary information, and/or trade secrets concerning the marketing of the shows to Vigo with the understanding he enjoyed a confidential relationship with Vigo and that Vigo would not misappropriate the information.

---

[1] Roughly translated this language amounts to Vigo telling other promoters in Argentina that they could shut down Mr. Reed's shows, and accusing Mr. Reed of sharp business practices.

## Causes of Action

### Count 1 – Tortious Interference with Existing Contract

63. Reed had a valid contract with 4G Producciones. The contract called for 4G to pay to Reed US$600,000.00 in exchange for Reed's granting 4G the rights to two concerts on May 19 and May 20, 2011. An additional term of the contract is that Reed would receive 30% of gross ticket revenue *after* the sale of 7500 tickets. Accordingly Reed had an ascertainable interest in the sale of tickets to these shows.

64. Vigo knew or had reason to know of Reed's interest in the contract with 4G evidenced by those e-mails referenced *supra*.

65. Vigo willfully and intentionally interfered with Reed's contract with 4G by advertising concerts despite the fact he had no interest in those concerts.

66. Vigo's interference proximately caused injury to Reed, which resulted in the following actual damage or loss: lost concert ticket revenues in an amount not less than $150,000.00.

67. Accordingly Reed seeks unliquidated damages within the jurisdictional limits of this court.

### Count 2 – Business Disparagement

68. Vigo published a disparaging written statement about Reed's interest in the concerts he was promoting.

69. The statement was false because Vigo had no contract with Reed.

70. Vigo published the statement with malice and without privilege, based on the souring of relations between Reed and Vigo, and with the intent that Reed's economic interest suffer.

71. Vigo published the statement without privilege. Vigo had no privilege granted him either by Reed or any circumstance so as to afford him a privilege to make the disparaging statement.

72. Vigo's false statement caused injury to Reed, which resulted in the following special damages: lost concert ticket revenues in an amount not less than $150,000.00.

73. Accordingly Reed seeks unliquidated damages within the jurisdictional limits of this court.

### Count 3 – Trade Secret Misappropriation

74. Reed is in the business of concert promotion. Reed has a competitive advantage over others in the same business because he has marketing information (tour schedules) not generally known or readily available to the general public. Indeed, Reed had a contractual relationship with certain talent permitting him to schedule said talent's shows in South America.

75. Vigo acquired knowledge of Reed's trade secret through a relationship of trust with Reed that gave rise to a duty of confidentiality. Vigo understood that concert dates and venues were confidential and should remain so for marketing purposes, to ensure for example not booking talent for dates and venues too close in time and place to similar acts. Vigo violated the duty of confidentiality by engaging in unauthorized advertising and attempted ticket sales.

76. Vigo's use and disclosure of Reed's trade secret caused injury to Reed, which resulted in the following damages: approximately $150,000.00 in lost ticket sales.

77. Accordingly, Reed seeks unliquidated damages within the jurisdictional limits of this court.

### F. Prayer

78. For these reasons, defendant asks the court to do the following:

    a. Render judgment that Vigo take nothing.

    b. Dismiss Vigo's suit with prejudice.

    c. Assess costs against Vigo.

    d. Award Reed attorney fees.

    e. Render judgment for Reed against Vigo for all his damages general and special, for attorney's fees, for pre and post-judgment interest at the highest rate allowed by law, and for all such other relief to which Reed may show himself justly entitled.

**[SIGNATURE PAGE FOLLOWS]**

Respectfully submitted,

by: */s/ Jonathan Winocour*
Jonathan F. Winocour
State Bar No. 24037730
David P. Ray III
State Bar No. 24027766
**WINOCOUR | RAY**
9400 N. Central Expressway, Suite 1204
Dallas, Texas 75231
(214) 575-6060
(214) 575-6220 (FAX)
**ATTORNEYS FOR DEFENDANT & COUNTERCLAIMANT**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on all counsel of record on this the 9th day of May, 2012:

by: */s/ Jonathan Winocour*